# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MAINE DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     1:10-cv-00077-JAW |
| | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVCIES, ET AL., | ) ) ) |
| | ) |
| Defendant. | ) |

## ORDER ON MOTION FOR SUMMARY JUDGMENT
## AND FOR JUDGMENT ON THE PLEADINGS

This case involves an arcane but costly question of administrative law: whether in 2002 and 2003, the state of Maine (Maine or State) improperly charged the United States Department of Health and Human Services $44,213,815 in excess costs, non-reimbursable costs, and unallowable administrative costs in connection with targeted case management (TCM) services under the Medicaid Act. The Maine Department of Health and Human Services filed a complaint against the United States Department of Health and Human Services (USHHS) and certain federal officials (collectively, the United States) seeking declaratory and injunctive relief against the federal government's disallowance of $29.7 million in federal financial participation (FFP) by the Centers for Medicare and Medicaid Services, an agency within the United States Health and Human Services (USHHS). Addressing the parties' dueling motions for summary judgment and the United States' motion in

the alternative for judgment on the pleadings, the Court concludes that the decision of the Departmental Appeals Board of USHHS withstands the State's attack and the Court grants the United States' motion for judgment on the pleadings and its motion for summary judgment and denies Maine's motion for summary judgment.[1]

## I.   STATEMENT OF FACTS

### A.   Procedural History

On February 19, 2010, Maine filed a complaint against the United States seeking declaratory and injunctive relief. *Compl.* (Docket # 1). The United States answered on May 11, 2010. *Ans.* (Docket # 7). On June 9, 2010, the United States moved for judgment on the pleadings or in the alternative for summary judgment. *Defs.' Mot. for J. on the Pleadings or, in the Alternative, for Summ. J.* (Docket # 9); *Mem. in Support of Defs.' Mot. for J. on the Pleadings or, in the Alternative, for Summ. J.* (Docket # 10) (*Def.'s Mot.*). On July 21, 2010, Maine responded to the United States' motion and filed its own motion for summary judgment. *Mot. of Pl. for Summ. J. and Consolidated Opp'n to Def.'s Mot. for J. on the Pleadings or, in the*

---

[1] The way this issue has reached the Court merits mention. In *Massachusetts v. Sebelius*, 701 F. Supp. 2d 182 (D. Mass. 2010), *appeal pending sub nom. Massachusetts v. Johnson*, No. 10-1625 (1st Cir.), the parties filed cross summary judgment motions on a similar issue. In *Sebelius*, the parties presented the issue as "case stated," a procedure approved by the First Circuit. *Id.* at 184 n.2. Under the case stated procedure, the Court is allowed to treat the undisputed facts as the established record and is not required to draw adverse inferences against each moving party. *Id.* Here, the United States filed a motion for judgment on the pleadings and, in the alternative, a motion for summary judgment, and Maine filed its own motion for summary judgment that also served as an opposition to the United States' motion. But these motions for summary judgment are not traditional motions with countervailing statements of material fact. Instead, they are each based on the administrative record from the Board, which has been filed with the Court. The Court has carefully reviewed the administrative record to determine whether the traditional approach of viewing the facts in the light most favorable to the non-movant would make a difference in the outcome. It has concluded that it does not. Accordingly, in framing the relief in this case, the Court grants both the United States' motion for judgment on the pleadings and its motion for summary judgment, both of which are based on the administrative record since the result under either procedural vehicle is the same.

*Alternative, for Summ. J.* (Docket # 16) (*Pl.'s Mot.*). The United States responded to Maine's summary judgment motion on August 9, 2010. *Defs.' Ob. and Opp'n to Mot. of Pl. for Summ. J.* (Docket # 18) (*Def.'s Opp'n.*). On August 23, 2010, Maine replied. *Pl.'s Response to Def.'s Opp'n to Pl.'s Mot. for Summ. J.* (Docket # 21) (*Pl.'s Reply*). The Court stayed the proceeding upon an assented to motion of the parties from September 30, 2010 to December 14, 2010, while they attempted to resolve the matter by settlement discussions. *Assented to Mot. for Stay of Proceedings* (Docket # 25); *Order* (Docket # 27); *Order* (Docket # 32). When these discussions proved unfruitful, they submitted the motions to the Court for decision on December 14, 2010.

## B. The Controversy

### 1. An Overview

The provision of social services may be viewed as an interlocking continuum from initial intake to the administration of direct services. For historical and funding reasons, the federal and state governments have sliced up these services, funding different services under different programs at different reimbursement rates. When Congress allocates funds, its determination of where federal money is to be spent must be obeyed, and it is the job of both federal and state governments to make certain that individual services are properly assigned to the correct program. In the specific context of this case, the dispute centers around funding for TCM services, "which are services to help a person gain access to needed medical, educational and social services," and funding for "the needed services themselves

(sometimes referred to as 'underlying' or 'direct' services.).'' *Def.'s Mot.* at 9 (quoting A.R.[2] at 3). The federal government says that TCM services are reimbursable by Medicaid but direct services are not. *Id.* at 8–9. The United States explains that some "freestanding social services that are funded through other programs, e.g. foster care or services provided through other state social services programs, are not considered TCM eligible for FFP under Medicaid." *Id.* In short, in the view of the United States, "costs that belong to other programs involving the provision of direct social services should not be allocated to Medicaid." *Id.* at 9.

In November and December 2007, the USHHS's Office of Inspector General (OIG) issued an audit report in which it found that Maine had overstated TCM costs for the federal fiscal years 2002 and 2003 in the amount of $44,213,815. *Id.* at 4. By letter dated October 8, 2008, the Centers for Medicare and Medicaid Services (CMS), the agency within the USHHS charged with implementing and overseeing the Medicare and Medicaid programs, disallowed $29,759,384 in federal financial participation (FFP) of Maine's claim for TCM expenditures for fiscal years 2002 and 2003. *Id.* at 5. Maine appealed the CMS disallowance to the Departmental Appeals Board (Board) of the USHHS. *Id.* On December 24, 2009, the Board issued a decision sustaining the CMS disallowance and ruling that Maine had not met its burden to prove that the disallowed expenditures were allowable under Medicaid. *Id.* Attach. 1 at 14. In Maine's Complaint, it says that the Board "erred in disallowing FFP for certain [TMC] activities of the State during the years in

---

[2] Citations to the Administrative Record are abbreviated "A.R."

question" and that the federal defendants' actions "are contrary to federal law, arbitrary and an abuse of discretion." *Compl.* ¶ 3.

## 2.    The Medicaid Program

The Medicaid Act (the Act), 42 U.S.C. § 1396 *et seq.*, authorizes a program in which the federal government provides matching funds (FFP) to participating states to assist them in providing health care to certain categories of needy and disabled persons.  Pursuant to the Act, the federal government contributes a specified percentage of the costs that states incur in providing medical services to their Medicaid-eligible citizens.  42 U.S.C. § 1396b(a).  The United States Supreme Court has explained that the "cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State" and the "purpose of Congress in enacting [Medicaid] was to provide federal financial assistance for all legitimate state expenditures under an approved Medicaid plan." *Harris v. McRae*, 448 U.S. 297, 308 (1980). Thus each state administers its own Medicaid program subject to federal requirements and approvals.

In 1985, Congress amended the Medicaid statute to include TCM services within the definition of reimbursable medical assistance that states can provide their Medicaid beneficiaries.  42 U.S.C. § 1396d(a)(19).  For fiscal years 2002 and 2003, the Act defined the TCM services subject to FFP:

> For purposes of this subsection . . . the term "case management services" means services which will assist individuals eligible under the plan in gaining access to needed medical, social, educational, and other services.

42 U.S.C. § 1396n(g)(2). Further, § 1396n(g)(1) allows a state to provide TCM services targeted to specified groups of Medicaid beneficiaries without regard to the usual requirements that services be provided statewide and be comparable in amount, scope and duration. 42 U.S.C. § 1396n(g)(1).

In 1988, Maine promulgated regulations defining specific groups to receive TCM services and enumerating the covered services. *See* A.R. at 170. Maine included "Families of Children who are Abused or Neglected or who are at Risk of Abuse or Neglect" and "Children and Young Adults Who Are in the Care or Custody of the Department of Human Services or of an Agency in Another State and Placed in Maine, and Families of Children Who are Receiving Post-Adoption Services." A.R. at 170, 203, 207. The Maine regulation defined case management services for these groups:

> Case study and assessment[3] is the collection and assessment of facts regarding the child, family and other relevant persons, in determining the nature of individual and family problems and the services needed to resolve these problems. These activities consist of interviewing, reviewing written materials, making an assessment of need, referring to providers, assessing the availability and accessibility of services, consulting with the Preventive Health Program agency outreach workers, preparing reports, making case recommendations and setting objectives.

*Id.* 204, 209.

---

[3] The regulation pertaining to "Children and Young Adults Who Are in the Care or Custody of the Department of Human Services or of an Agency in Another State and Placed in Maine, and Families of Children Who are Receiving Post-Adoption Services" defines "reassessment," rather than "assessment," and contains other minor grammatical differences from the regulation pertaining to "Families of Children who are Abused or Neglected of who are at Risk of Abuse or Neglect." The Court is unaware of any substantive difference between the two definitions and quotes from the latter.

Maine says that in the mid-1990s, it proposed to the Health Care Finance Agency (HCFA)—the CMS's predecessor—a flat rate of $1,000 per month per TCM service provided by the state Office of Child and Family Services (OCFS), a division of the state Department of Human Services. *Pl.'s Mot.* at 3, 5–6. The Boston Regional Office of HCFA balked. *Id.* at 6. Maine asserts that, as a consequence, Maine and HCFA officials met in February 1996 and negotiated a lower rate "of approximately $750, with a provision for increasing the rate to keep pace with changes in payroll costs due to increases of the pay of OCFS workers." *Id.* Maine claims that HCFA was aware of this flat rate since Maine's expenditures for TCM were reflected in the quarterly budget and expense reports that the state filed with HCFA as a part of the federal reimbursement process. *Id.* Maine says HCFA approved federal reimbursement based on this rate for several years. *Id.*

In January 2001, the USHHS issued State Medicaid Directors Letter (SMDL) # 01-013, which clarified the circumstances under which the USHHS would allow TCM service claims. A.R. at 271–74. The SMDL clarified that referrals to medical care providers were reimbursable under other provisions of the Social Security Act, not billable to Medicaid, and that states must properly allocate TCM services for foster care populations between two programs, the foster care program and Medicaid, in accordance with OMB[4] Circular A-87, 2 C.F.R. Pt. 225. *Id.* at 274. In the SMDL, the CMS explicitly stated that "Medicaid case management services do not include payment for the provision of direct services (medical, educational, or social) to which the Medicaid eligible individual has been referred." *Id.* at 272. At

---

[4] Office of Management and Budget.

the same time, the USHHS did not promulgate any regulations defining the nature of case management services until after the period subject to audit in this case.

On October 1, 2001, Maine amended its Medicaid state plan and on March 28, 2002, the HCFC approved the amendment. *Id.* at 167. The definition of services in the Maine amendment reads:

> Case management services include client intake and assessment, plan of care development, service coordination and advocacy, monitoring of the client and evaluation of the appropriateness of the plan of care.

*Id.*

### 3.     The OIG Audit

In November 2007, the OIG issued its audit report of Maine's TCM services for federal fiscal years 2002 and 2003. *Id.* at 275–92. The report contained three major findings: 1) that Maine had overstated the cost of providing TCM by $9,990,985; 2) that Maine had overcharged the federal government in the amount of $22,152,551 in non-reimbursable salaries and related costs for "direct social services"; and, 3) that Maine had overcharged the federal government $12,070,270 in non-reimbursable salaries and related costs for "administrative services." *Id.* at 276. The OIG found that Maine had overcharged the federal government a total of $44,213,815. *Id.* at 277. On March 20, 2008, the CMS affirmed the audit findings and disallowed $29,759,384 of federal reimbursement, a figure that represented the federal share of $44,186,699.[5] *Def.'s Mot.* Attach. 1 at 5.

### 4.     Maine Disputes the Audit Findings

---

[5] The Court could find no explanation for the $27,116 difference between these two figures; however, the net figure of $29,759,384 is consistent throughout.

Maine objected to the audit findings on two bases: first, it objected to the OIG's rejection of the agreed-upon flat rate of $750; and second, it commissioned its own independent study by its consultant, David Zentner, who concluded that the OIG's sampling procedure misrepresented the content of the actual case files and when the individual files were properly analyzed, the recorded activity fell within federal statutory and regulatory definitions. *Pl.'s Mot.* at 7–8. On October 8, 2008, the CMS's regional administrator issued a letter decision to Maine adopting the OIG recommended disallowance. *Id.* at 8. Maine appealed to the Board. *Id.*

### 5.     The Board Decision

On December 24, 2009, the Board issued its decision. A.R. at 1–26; *see Me. Dep't of Health and Human Servs.*, Docket No. A-09-12, 2009 WL 5227271 (H.H.S.) (App. Div. USHHS Dec. 24, 2009).[6] After reviewing the history of the controversy, the Board observed that the federal government has "the initial burden to provide sufficient detail about the basis for its determination to enable the grantee to respond." *Id.* at 9. If the federal agency carries this burden, the grantee "must show that the disputed expenditures are allowable." *Id.* In other words, in this case Maine was required to demonstrate that the United States' findings were "legally or factually unjustified." *Id.*

The Board set forth the OIG audit findings and concluded that the USHHS had produced sufficient detail about its determination to meet its initial burden and, therefore, the burden shifted to Maine to demonstrate that the USHHS

---

[6] Throughout the rest of the opinion, the Court has used the Administrative Record citation for the Board Decision.

findings were legally or factually unjustified. *Id.* In concluding that Maine had failed to meet its burden, the Board addressed each area: "excess costs", administrative costs, and costs of direct services. *Id.*

### a. "Excess Costs": $9,990,985

The Board rejected Maine's contention that its negotiated rate should prevail. *Id.* First, the Board observed that "[t]here is no evidence in the record that CMS negotiated or approved the TCM payment rates used by the State during the relevant period of time." *Id.* Second, the Board noted that "the State does not cite—or rely upon—any legal principle that would authorize the Board to accept the allegedly negotiated rates without confirming that those rates complied with the state plan requirement that TCM rates be 'cost-based.'" *Id.* at 9–10. The Board said that the OIG audit had found that Maine had charged USHHS between $864 and $899 per beneficiary month and that Maine "does not dispute the finding" in the OIG audit that Maine had failed to justify the rates it had charged in 2002 and 2003. *Id.* at 10. Although the Board considered Maine's attempt to justify those rates, the Board deemed the State's attempt "clearly insufficient to meet the State's burden."[7] *Id.* The Board accepted the OIG finding of $9,990,985 in "excess costs". *Id.* at 10.

---

[7] In support of its position, the "only evidence" that Maine apparently presented consisted of documents that reflected how the State had calculated its monthly per-client TCM rates for state fiscal year July 1, 1995, through June 30, 1996. A.R. at 10. The State asserted that these documents confirmed that OCFS social workers spent 90.17 percent of their time providing "matchable" (Medicaid allowable) case management services to Medicaid clients. *Id.* The State attached a table of data that it claimed showed the results of a "social worker time study analysis." *Id.*
The Board was not convinced. It pointed out that the State failed to demonstrate that the rates for state fiscal year 1995–96 were the basis for the State's TCM claims for 2002 and 2003. *Id.* at 10–11.

### b. Administrative Costs: $12,070,279

The Board turned to the State's administrative costs. *Id.* at 11. The State's first objection to the OIG's audit finding was that it was "'impossible' to determine how the OIG determined that the State's TCM claims . . . included $12,070,279 in unallowable administrative costs." *Id.* The State protested that "[a]t the very least, CMS should be required to explain how it reached the $12 million figure." *Id.* at 11–12. Accordingly, the Board ordered the CMS to "provide a fuller explanation of how the OIG determined the amount of administrative costs that were excluded from its calculation of the new TCM rates." *Id.* at 12. In considering the CMS's response, authored by the OIG, the Board observed that Maine "has not questioned the OIG's and CMS's explanation for the audit finding concerning administrative costs." *Id.* The Board concluded that the CMS, through the OIG, had "adequately explained the basis for its finding." *Id.*

The State's substantive objections included the contention that its administrative costs were properly reimbursable because the state plan provided that payment rates will be "cost based" while not distinguishing between direct and indirect costs. *Id.* Maine proposed that, because state and federal law contemplate that state agencies will provide TCM services, the administrative costs of those agencies must be reflected in the payment for those services. *Id.* Furthermore, Maine argued that neither the Medicaid statute nor its regulations prohibited the

---

It noted that the State exhibit itself was not properly authenticated. *Id.* at 11. Further, the Board concluded it had no way to determine the validity of the percentage of time that Maine claimed the social workers spent in TCM services, because the State had failed to provide evidence about how the study was conducted or the criteria its authors had used to arrive at the results. *Id.* Finally, there was no evidence that the State had made the study available to OIG during its audit. *Id.*

states from including in their TCM rates, the administrative costs that made those activities possible. *Id.* at 13.

The Board characterized Maine's argument as saying that "the administrative costs of a state agency are eligible for federal Medicaid reimbursement to the extent they support the provision of allowable (Medicaid-covered) TCM services." *Id.* at 13. The Board did not reach Maine's substantive argument because it concluded that the State had not proven the facts necessary to substantiate its premise—"that the particular administrative costs identified by the OIG as unallowable . . . were incurred, in whole or part, to support the provision of allowable TCM services."[8] *Id.* The Board accepted the CMS's finding that the State's TCM claims for FFYs 2002 and 2003 "included $12,070,279 in unallowable administrative costs." *Id.* at 14.

### c.    Costs of Direct Services:  $22,152,551

Finally, the Board addressed Maine's objection to the OIG's conclusion that certain activities performed by OCFS social workers constituted direct services, rather than TCM services. *Id.* Relying on a study of 100 sample claims by Mr. Zentner, Maine questioned the OIG's conclusion that substantial portions of Maine's social worker service constituted a direct social service (such as foster care) rather than TCM. *Id.* at 14–15. Noting that in 2005, Congress enacted the Deficit

---

[8] The Board also addressed an issue that the State had raised initially: that the OIG audit disallowed administrative costs that Maine had never charged to USHHS. Once the OIG more fully explained the details of its figures, however, Maine "did not question or dispute any aspect of that explanation or otherwise explain why its contentions regarding administrative costs continued to be relevant and persuasive." A.R. at 13. The State also failed to present evidence that CMS had "disallowed expenditures that were not charged to its Medicaid program." *Id.* at 14. The Board rejected the State's contention. *Id.*

Reduction Act (DRA), which amended § 1915(g)(2), the State contended that the disputed services met the pre-DRA definition of case management in § 1915(g)(2) and were consistent with definitions in the state plan and regulations. *Id.* at 15. Furthermore, Maine said that, in the absence of federal regulation, the State was within its rights in relying on its own interpretations of § 1915(g)(2) in its state plan and regulations, and not on the CMS's interpretation in the SMDL. *Id.* Finally, the State complained that the OIG audit did not disclose the criteria the OIG applied to determine that a particular service was allowable as a TCM service. *Id.*

The Board rejected each of Maine's contentions. First, it said that the OIG audit clearly revealed its auditing criteria—namely, the interpretive guidance in SMDL 01-313—to determine whether a sample service was a TCM service. *Id.*

Second, the Board rejected Maine's claim about reliance on its own plan and regulations, because the State failed to explain in any detail "how its reliance on the state plan or regulations might reasonably have caused it to reach different conclusions than CMS about the allowability of the sample services." *Id.* The Board noted that Mr. Zentner himself said that he had reviewed each documented service to determine whether it constituted case management "as defined in federal law and federal written interpretations," not as defined in the state plan and regulations. *Id.* at 15–16.

Third, the Board rejected Maine's contention that the CMS could not legally require it to adhere to the USHHS's interpretative guidance in the January 2001 SMDL. *Id.* at 16. Moreover, the Board refused to credit Maine's view that its own

interpretation of its plan and regulations provided a superseding interpretation of a federal statute, especially since it contradicted a federal agency's interpretation of its own statute. *Id.* at 16–17.

Fourth, regarding Maine's substantive objection to the CMS's interpretation of § 1915(g)(2), the Board concluded that it "lacks foundation." *Id.* at 17. Other than generally asserting that the SMDL added "restrictions" to the operation of the statute, the Board observed that Maine failed to specify what those restrictions were. *Id.* Furthermore, the Board noted that in enacting the DRA, Congress essentially ratified the CMS's interpretation of the statute, and that the Board itself has held that SMFL 01-013 reasonably interpreted the statute. *Id.* at 17–18, 18 n.13.

Finally, the Board made a detailed comparison between the audit findings and the contents of the SMDL and with one exception, concluded that the OIG audit findings were clearly consistent with the agency's guidance.[9] *Id.* at 18–22.

### d. The State's Burden To Discredit the OIG Audit Findings

Lastly the Board addressed whether Maine's attack against the methodology of the OIG audit met its burden of proof. *Id.* at 22–25. Maine had disputed the OIG's choice of sample size and its sample selection method, but after the OIG explained its methodology, Maine failed to further respond. *Id.* at 22, 24. The

---

[9] The Board discovered one error regarding sample 36. Although it upheld the assessment on that sample because an apparent inconsistency may not have made a difference and because Maine has not expressly raised the question on appeal, the Board directed CMS to make "any appropriate adjustment". A.R. at 22. In its memorandum, the United States confirmed that on February 18, 2010, the Agency issued a small reduction in the total disallowance. *Def.'s Mot.* at 2 n.2. The United States asserted that this minor issue is not before the Court, *id.*; the State did not reply to this minor question.

Board concluded that Maine had submitted no evidence to support its objections and ended by saying that "it was incumbent on the State to do more than assert undeveloped and unsubstantiated objections to the OIG's statistical and auditing methods." *Id.* at 25.

## II.   THE PARTIES' POSITIONS

### A.     The United States' Argument

The United States contends that it is entitled to judgment in this action for a variety of reasons.  First, it cites a recent case from the District of Massachusetts, which it claims "closely resembles" this case.  *Def.'s Mot.* at 5–6.  On March 24, 2010, the United States District Court for the District of Massachusetts issued *Massachusetts v. Sebelius*, which affirmed a Departmental Appeals Board affirmance of the United States' disallowance of FFP funds for the commonwealth of Massachusetts under § 1396n(g)(2).  *Id.* (citing *Sebelius*, 701 F. Supp. 2d. at 200). Although the case is on appeal to the First Circuit, the United States says that the district court in Massachusetts resolved the same questions that Maine is raising in this case and that this Court should make short work of this matter simply by adopting the *Massachusetts* Court's reasoning.  *Def.'s Mot.* at 6.

Second, citing the high standard for overturning an agency decision and the narrow scope of judicial review, the United States argues that the Board decision is neither arbitrary nor capricious because it has a rational basis.  *Id.* at 6–7.  Thus, says the United States, it should be affirmed.

Third, relying on the contents of the SMDL, the United States urges the Court to conclude that only services that assist Medicaid-eligible individuals to gain access to needed medical, social, educational, and other services were eligible for Medicaid FFP. *Id.* at 8. According to the United States, because free-standing social services are funded through other programs, the CMS's decision to reimburse only activities that assist in gaining access to the services, not the services themselves, is entirely reasonable. *Id.* at 8–9.

Finally, turning to its contention that the TCM provisions do not authorize coverage for direct services, the United States argues: 1) that the CMS view of § 1396n(g)(2) is consistent with the legislative history of the Act and inconsistent with Maine's broad interpretation, *id.* at 10–11; 2) that the Court should accord deference to the CMS's interpretations of TCM provisions, *id.* at 11–12; 3) that the State's view is erroneous concerning the Early Periodic Screening, Diagnosis and Treatment (EPSDT) provisions of the Act, *id.* at 12–13; and 4) that the Board's final administrative decision in this case is supported by substantial evidence. *Id.* at 13–17.[10]

## B. Maine's Argument

First, Maine disagrees with the United States about whether the CMS's interpretation of TCM provisions should be entitled to deference. *Pl.'s Mot.* at 9–10. Maine urges the Court to adopt the First Circuit view in *Massachusetts v. Sec'y of*

---

[10] In its motion, the United States anticipated an argument that Maine had made earlier: that the disallowance would violate the Spending Clause of the United States Constitution, Art. I, § 8, cl. 1. *Id.* at 17–19. In its response and motion, however, Maine did not mention the Spending Clause argument and the State therefore waived this issue.

*Health & Human Servs.*, 816 F.2d 796, 800-01 (1st Cir. 1987) *aff'd in part and reversed in part sub nom. Bowen v. Massachusetts*, 487 U.S. 879 (1988), which stated that, although an agency's interpretation of its own regulations is entitled to great deference, an agency's interpretation of an enabling statute is entitled only to "some weight." *Id.* Furthermore, the State argues that, as in *Bowen*, the court's deference over interpretive disputes must "give way somewhat" in a dispute between federal and state governments to the "cooperative federalism goals of the Medicaid program." *Pl.'s Mot.* at 10 (*quoting Bowen*, 816 F.2d at 801).

Second, Maine contends that the OIG's classification of state services either as "direct" or as "case management" was arbitrary. *Id.* at 10–14. Maine says that the "distinction between 'direct services' and case management services was created in a sub-regulatory guidance promulgated by CMS and is not entitled to a high level of deference." *Id.* at 10. Maine claims that the auditor's application of these categories "appears to have been made on an ad hoc and unfounded basis." *Id.* at 11. It points to three examples where the OIG deemed the services were direct services, but where, in the State's view, the OIG's characterization of these services "lacks any rationale." *Id.* at 11–13. Maine analogizes this case to *Bowen* and defines the question as "whether CMS, by means of a non-regulatory interpretation, can exclude services clearly intended to be covered by the federal statute." *Id.* at 13.

Maine distinguishes *Sebelius*, observing that "Massachusetts' method of charging for its case management services differed from Maine's." *Id.* Maine says that Massachusetts segregated its charges into cost centers and the dispute in

*Sebelius* was whether the CMS's disallowance of entire cost centers based on how they were defined by the commonwealth, was arbitrary. *Id.* By contrast, Maine contends that the CMS's disallowance of its activities was based on its interpretation of individual case worker notes and that the CMS's interpretation of the meaning of those notes was arbitrary. *Id.*

Turning to administrative costs, Maine argues that "[t]he manner in which the OIG calculated the amount of unallowable administrative costs is unsupported by substantial evidence in the record, arbitrary and inconsistent with its own determination as to the percentage of time spent by case workers providing case management services." *Id.* at 14. Maine criticizes the OIG's decision to classify the payroll costs of support staff as "unallowable," a decision Maine says was made "solely because those individuals were not listed in the state plan as among those authorized to provide case management services." *Id.* at 15.

Maine further objects to the OIG's elimination of "miscellaneous administrative costs" such as "telephone allowance, cellular phone service, office supplies, and travel expenses." *Id.* Saying that the OIG never demonstrated that Maine actually recovered these costs under another federal program, Maine rejects the OIG's explanation that it eliminated these costs because they were potentially recoverable under other federally-funded programs. *Id.* The State also asserts that in *Bowen*, the First Circuit rejected the CMS approach. *Id.* at 15–16.

Next, Maine argues that the OIG disallowance "employs an arbitrary classification of personnel involved in the overall provision of case management

services" and also relied on arbitrary classifications of allowable and excluded expenses. *Id.* at 16–17. Maine asserts that the OIG interpretation of the statute and the CMS guidance "would virtually eliminate OCFS as a provider of Medicaid targeted case management services." *Id.* at 17. In Maine's estimation, the OIG "implicitly determined that about half the time of OCFS case workers in the two audit years was spent providing case management services." *Id.* at 17–18. However, Maine says that instead of allocating the disallowed administrative costs to the portion of unallowable case worker activities, the OIG improperly "chose to remove arbitrarily defined segments of payroll and miscellaneous expenses to calculate the administrative costs they deemed unallowable." *Id.*

Finally, Maine attacks the OIG's refusal to use the state rate, which Maine contends "resulted from a negotiated agreement between officials of [Maine] and the regional director of HCFA." *Id.* at 18. Maine stresses that "[t]hroughout this appeal, [the] CMS has not denied that this meeting occurred or that the parties reached an agreement as to the rate the State would be allowed to charge for OCFS's case management services." *Id.* In fact, Maine says that it charged the United States at this negotiated rate and that the United States paid it. *Id.*

### C.    The United States' Response

In its Response, the United States selectively addressed the State's contentions. The United States disagrees with Maine's view of the limited applicability of *Sebelius*. *Def.'s Opp'n.* at 2. Instead, the United States says that *Sebelius* "squarely addressed the Federal Agency's interpretation of the Medicaid

targeted case management statute that was embodied in the State Medicaid Manual § 4302, A.R. 316, and State Medicaid Director Letter #01-013, A.R. 271." *Id.* The United States concludes that the district court opinion is "directly on point and is entitled to greater weight than plaintiff would admit." *Id.*

The United States also reiterates the high standard for judicial review of an agency action. *Id.* at 2–3. It cites the First Circuit case of *Doe v. Leavitt*, 522 F.3d 75 (1st Cir. 2009), and Supreme Court case of *Wisconsin Department of Health and Family Services v. Blumer*, 534 U.S. 473, 496 (2002), as authority for giving judicial consideration to the agency's view of its controlling statute. *Id.* at 3–5.

The United States disputes Maine's contention that it agreed to a negotiated rate and reneged. It points out that the Court's ruling must be based on the administrative record, and argues that the record does not support Maine's version of the events. *Id.* at 6–7. The United States urges the Court to conclude that belated attacks on the auditor's findings have been waived. *Id.* at 7–8. The United States also disputes Maine's contentions that the specific examples in Maine's response compel the conclusion that the audit was arbitrary. *Id.* at 10–13.

### D.    Maine's Reply

Maine rejects the United States' interpretation of *Doe v. Leavitt*, saying that the First Circuit adopted a "sliding scale" approach approved by the United States Supreme Court in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Pl.'s Reply* at 1–2. Maine contends that *Doe* instructs that the degree of deference depends on "such factors as the thoroughness of the agency's consideration of the issue, the validity of

its reasoning, and the consistency of its interpretation." *Id.* at 2. But Maine argues that "*Doe v. Leavitt* is easily distinguished from the case at bar." *Id.* The State maintains that in *Doe*, the agency was interpreting a "fairly straightforward statute," that the agency interpretation furthered Congress's evident purpose, and that the interpretation was issued by the Secretary himself, none of which, Maine says, applies here. *Id.* at 2–3. In response to the United States' support for the auditor's findings, the State contends that the Court need not defer to the auditor's interpretation "when that interpretation is demonstrably wrong." *Id.* at 3. The State reasserts its earnest contention that the auditor's work is based on misclassification and is flawed, including a double deduction for administrative services that had already been reduced. *Id.* at 3–5.

## III. DISCUSSION

### A. Standard of Review

Maine seeks judicial review of the Board action under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* *Compl.* ¶ 4. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983); *Sebelius*, 701 F. Supp. 2d at 196. To be arbitrary and capricious is to lack a rational basis. *Motor Vehicle Mfrs.*, 463 U.S. at 42–43; *R.I. Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*, 929 F.2d 844, 855 (1st Cir. 1991). The Supreme Court has instructed that "[t]he scope of

review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle*, 463 U.S. at 43; *Caribbean Petroleum Corp. v. U.S. Envtl. Prot. Agency*, 28 F.3d 232, 234 (1st Cir. 1994). In other words, if the agency has articulated a rational basis for its decision, the court "must accept the validity of that decision." *Sebelius*, 701 F. Supp. 2d at 196; *see Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 290 (1974) (noting that the "Commissioner's treatment of the evidence . . . is not a paragon of clarity" but because the Court could "discern in the Commission's opinion a rational basis . . . the 'arbitrary and capricious' test does not require more").

Even though an agency's final decision is measured by the highly deferential "arbitrary and capricious" standard, the reviewing court is not a mere "rubber stamp." *Fed. Labor Relations Auth. v. Aberdeen Proving Ground, Dep't of the Army*, 485 U.S. 409, 414 (1988) (per curiam) (stating that the reviewing court "must not rubber stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute" (internal punctuation omitted)). At the same time, the agency's determination must be upheld if they are supported by "substantial evidence." 5 U.S.C. § 706(2)(E) (providing that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence"); *Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 777 (1st Cir. 2000). As the First Circuit explained in *Sistema*, the court must "focus on

whether the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." 234 F.3d at 777 (internal punctuation omitted). The burden of proof is on the party contesting the agency determination.[11] *Id.*

## B. Agency Deference

The parties have engaged in a prolonged debate about the degree of deference to be accorded to the agency's interpretation of "case management services." *See Def.'s Mot.* at 7, 7 n.7; *Pl.'s Mot.* at 9–10; *Def.'s Opp'n.* at 2–6; *Pl.'s Reply* at 1–3. The United States favors "substantial deference," *Def.'s Mot.* at 7, while the State prefers "some weight," *Pl.'s Mot.* at 9–10. The Court has carefully reviewed the parties' arguments and relevant case law, and follows the *Sebelius* Court on this same issue. *See Sebelius*, 701 F. Supp. 2d at 193–95. The degree of judicial deference to an agency interpretation of an enabling statute "depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Id.* at 193–94 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)). Because in this case the agency's interpretation was reasonable, well-considered, and consistent with its own interpretations and with the legislative

---

[11] This federal standard for judicial review of administrative review is not novel. The state of Maine applies essentially the same standards for judicial review of state agency decisions. 5 M.R.S. § 11007(4)(C)(5),(6); *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 7, 870 A.2d 566, 569 ("We do not vacate an agency's decision unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or an error of law; or is unsupported by the evidence in the record.").

history, the Court adopts the *Sebelius* Court's view that the Manual and the Directors Letter are entitled to "some deference." *Id.* at 195.

### C.    The Alleged State-Federal Agreement

Maine insists that the United States is reneging on an agreement it struck with the state in February 1996, whereby it agreed to reimburse Maine for the contested services at a flat rate of $750 with periodic escalators. *Pl.'s Mot.* at 18–19. When Maine raised the issue before the Board, the Board found that there was "no evidence in the record that CMS negotiated or approved the TCM payment rates used by the State during the relevant time period." A.R. at 9. In addition, the Board observed that such an agreement would be contrary to law and regulation. *Id.* at 10. In other words, according to the Board, to comply with the Act, if the State wished to be reimbursed at a flat rate, the rate still had to be "cost-based". *Id.*

The United States says that this Court's review of the issues must be based on the administrative record, which, in the United State's view, contains no evidence of such an agreement. *Def.'s Opp'n.* at 6–7. The United States points out that the State's memorandum merely cites page 280 of the record, which details only a lack of evidence of any agreement. *Def.'s Opp'n.* at 6–7.

The Court agrees with the United States. The parties filed the administrative record that was before the Board, and the Court must base its rulings on the facts developed before the agency. *Collins v. Metro. Life Ins. Co.*, 477 F. Supp. 2d 274, 276 n.1 (D. Me. 2007) (striking an affidavit that included facts not found in the administrative record). The State's sole reference to the administrative

record does not begin to support its argument that such an agreement existed or, if it did, that it is binding on the United States. The State's citation was to a portion of the audit report explaining:

> Family Services officials told us that they had calculated a reimbursement rate for TCM services of more than $1,000 per month in 1996 but that CMS had found this rate unacceptably high. That same year, according to the officials, Family Services and regional CMS officials agreed verbally to a lower TCM rate. This monthly rate of $720 was based neither on costs nor on a mathematical calculation. However, neither Family Services nor CMS officials were able to provide any documentation of this agreement.

A.R. at 280. This reference in the OIG audit report describes the State's argument; it is not evidence itself. Furthermore, the OIG rejected the State's contention that it had carved a side agreement with the CMS in which the federal government agreed to pay Maine a flat rate. *Id.* at 287–88. Among other reasons, the OIG noted the absence of documentation and the contradiction between a flat rate and the cost-based reimbursement process that the Act contemplated. *Id.*

The State's proposition that it entered into an enforceable side agreement with the United States for flat rate reimbursement of TCM services is simply unsupported. There is no evidence in the administrative record that such an agreement ever existed: no affidavits from the involved officials, no contemporaneous notes, no confirmatory correspondence, no written memorandum of understanding, no contract, nothing in writing from state or federal officials. The "evidence" consists of the State's attorneys' say-so, but a description of evidence in a legal memorandum is not evidence. *Cf. United States v. Marek*, 548 F.3d 147, 154 n.9 (1st Cir. 2008) (noting in a criminal defendant's appeal as to the sufficiency of

the evidence that "it is improper to consider mere argument, no matter how good or bad, as evidence in support of a conviction").

Governments tend not run like businesses. Even so, here the state of Maine is claiming that its high officials traveled to Boston and formally negotiated and entered into an agreement involving tens of millions of taxpayer dollars and yet it has produced no written contemporaneous documentation and no statements by the involved state officials to confirm the agreement ever existed. The Board was acting well within its authority in determining that the State failed to prove the existence of this purported agreement.

Furthermore, the Court agrees with the United States that a flat rate, unjustified by actual costs, would have been contrary to the Act's reimbursement scheme and therefore of questionable validity. *See* 42 U.S.C. § 1396b(a)(1) ("[T]he Secretary . . . shall pay to each State . . . an amount equal to the Federal medical assistance percentage . . . of the *total amount expended* during such quarter as medical assistance under the State plan." (emphasis supplied)). Federal regulation provides that each state must adopt a state plan, 42 C.F.R. § 430.10, and each state must "[m]aintain an accounting system and supporting fiscal records to assure that claims for Federal funds are in accord with applicable Federal requirements." 42 C.F.R. § 433.32(a). As the Supreme Court explained in *Bowen*, federal financing assistance funds, called "reimbursement[s] . . . [are] actually a series of huge quarterly advance payments that are based on the State's estimate of its anticipated funds expenditures." 487 U.S. at 883–84 (citing 42 U.S.C. § 1396b(d)).

The estimated expenditures are "adjusted to reflect actual expenditures" and "[o]verpayments may be withheld from future advances." *Id.* at 884 (citing 42 U.S.C. § 1396b(d)(5)). The State's contention that the United States exempted Maine conflicts with the federal statutory and regulatory scheme as a whole, *Sebelius*, 701 F. Supp. 2d at 186 ("[T]he federal government manages the state plans in mind numbing detail."), and the State has not explained how a flat rate for the state of Maine would be consistent with these statutory and regulatory provisions.

In short, Maine's claim that the United States entered into an enforceable side agreement with the United States for flat rate reimbursement of TCM services is unsupported by the record and improbable in light of federal law and regulation. In the absence of any evidence to buttress Maine's assertion, and in light of legal authority indicating the contrary, the Board's rejection of the State's position was virtually compelled; there is nothing about the Board's decision on this issue that is arbitrary, capricious or contrary to law.

### D. The OIG's Classification of TCM Services

The heart of the State's case is its attack against the United States' decision to distinguish between direct services and case management services and the OIG determinations as to what services fit in each category.

#### 1. The Agency's Interpretation

In 2002 and 2003, the Act defined "case management services" as "services which will assist individuals eligible under the plan in gaining access to needed

medical, social, educational and other services."  42 U.S.C. § 1396n(g)(2)(A)(i).  In 2005, Congress amended this provision when it enacted the Deficit Reduction Act and expressly stipulated that case management services "does not include the direct delivery of an underlying medical, social, educational and other service to which an eligible individual has been referred." [12] 42 U.S.C. § 1396n(g)(2)(A)(iii).

Before 2005, USHHS had interpreted the term "case management services" to exclude direct services.  The USHHS publicized its interpretation in a State Medicaid Manual (SMM), which it issued in 1991, A.R. at 316–27, and in a SMDL dated January 19, 2001, A.R. at 271–74.  The SMM stated:

> Although FFP may be available for case management activities that identify the specific services needed by an individual, assist recipients in gaining access to these services, and monitor to assure that needed services are received, FFP is not available for the cost of these specific services unless they are separately reimbursable under Medicaid.

A.R. at 322.  The SMDL stated that "[i]n general, allowable activities are those that include assistance in accessing a medical or other service, but do not include the direct delivery of the underlying service."  A.R. at 272.  The SMDL further clarified that "Medicaid case management services do not include payment for the provision of direct services (medical, educational, or social) to which the Medicaid eligible individual has been referred."  *Id.*

## 2.     The OIG Audit

According to the OIG, it performed fieldwork at the Family Services offices in Augusta, Maine, from April to November 2005.  A.R. at 280.  The OIG reviewed "a

---

[12] The 2005 amendments further listed numerous services that are not "case management services." 42 U.S.C. § 1396n(g)(2)(A)(iii)(I)-(VIII).

random sample of 100 beneficiary months containing 604 services provided to 99 beneficiaries" and found that Family Service social workers spent "52 percent of their time in FY 2002 and 61 percent in FY 2003 performing services that did not meet the definition of TCM." *Id.* at 284.

### 3. The State's Objections

The State does not dispute that USHHS issued these clarifying guidance documents but it contends that the OIG erred when it attempted to differentiate between direct services and case management services. The effect, Maine argues, is to distinguish among mixed services based on arbitrary line-drawing—a conclusion consistent with the "arbitrary and capricious" standard for judicial review.

Because the Board has already considered and rejected the State's argument, Maine faces a substantial hurdle. The OIG audit was before the Board; the Board sifted through the record evidence; it ordered a fuller explanation from the OIG on some issues; it concluded that Maine's position was not sustained; and, it explained the bases for its decision. A.R. at 14–22. Under *Sistema*, Maine bears the burden to convince the Court that the Board failed to "examine the relevant data and articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sistema*, 234 F.3d at 777 (internal quotation marks omitted) (quoting *Motor Vehicle*, 463 U.S. at 43).

The Court readily concludes that the State has failed to meet its burden. Having carefully reviewed the Board Decision, the Court need go no further; the Board Decision on its face more than meets the *Sistema* standards for affirmance.

Nevertheless, out of respect for the parties, the Court will address the specific points the State urges.

Maine contends that the OIG's actual classification of social services as direct as opposed TCM services was arbitrary. *Pl.'s Mot.* at 10–13. It cites three examples from the case note entries. Example One concerns the activities of a social worker that the OIG disallowed as direct foster care. *Id.* at 11. Maine says that the case note supporting the activity demonstrates that the worker was arranging for transportation for direct care, not providing direct care. *Id.* The United States responds that the case note failed to substantiate reimbursement because it failed to document information required by the CMS State Medicaid Manual and that the note suggested a service to the beneficiary's mother, not to the beneficiary. *Def.'s Opp'n.* at 11 (citing § 4302.2(G)(1)). Furthermore, the United States observes that the SMDL provides that "if a child has been referred to a state foster care program, any activities performed by the foster care case worker that relate directly to the provision of foster care services cannot be covered as case management." *Id.* (citing A.R. at 272). The United States says that since the beneficiary was in foster care, "the service would not be allocable to Medicaid because it involved an activity performed by the beneficiary's foster care case worker." *Id.*

Example Two simply states "L—called to let me know she needs a ride to court today. I authorized ABC taxi." *Pl.'s Mot.* at 11–12. The State says that the OIG's determination that this case note reflected direct work service was arbitrary, and claims the activity "clearly falls within the scope of case management

activities." *Id.* The United States responds that the case note violated CMS State Medicaid Manual § 4302.2(G)(1), which requires specific information that was missing from the note. *Def.'s Opp'n.* at 12. The United States says that the service was not allocable because it "does not support any services provided to the beneficiary. The case notes document contacts with the abuser." *Id.*

Example Three says that the case worker met with a teacher and was updated as to the progress of a child. *Id.* The State says that the case worker was not providing direct care but was monitoring the success of the educational services to which the member had been referred. *Id.* Again, the United States responded that once a foster child has been referred to a state foster care program, "any activities performed by the foster care case worker that relate directly to the provision of foster care services cannot be covered as case management." *Id.* at 12–13.

These examples reflect the wisdom of limiting the judicial role in the oversight of factual findings of an administrative agency. In Example Two, the State says that the case worker's arranging for a taxi ride for "L" was an indirect service since the taxi cab company was providing the service, i.e. the ride. The United States says that "L" was the abuser, not the beneficiary. The State did not respond to this point. On the face of the case note, the following appears: "Contact Type: Abuser." A.R. at 422. This entry appears with all other contacts with "L". A.R. at 422–24. Thus it appears on the face of the case notes that the United States

correctly identified this contact as being not with the beneficiary but with the abuser.

Regarding both Examples One and Three, the United States observes that the Foster Care and Adoption Assistance Program, 42 U.S.C. § 675(1), (5), (6), requires each State:

> to implement a case plan for the child with numerous elements, including the placement and safety, proper care, services to the foster family, addressing the needs of the child, maintenance of health and education records, a plan for ensuring educational stability, older child transition, a case review system with periodic review and evaluation, and administrative review that includes a panel with at least one member who is not responsible for case management of or delivery of services to the child or parent.

*Def.'s Opp'n.* at 13 n.10. The United States argues in effect that once the child is passed into the Foster Care and Adoption Assistance Program (FCAAP), services like arranging for transportation to a provider or monitoring a child's educational progress fall within the FCAAP, not TCM. *Id.* The State did not respond to this argument, which contemplates a dividing line between services properly chargeable under Medicaid and services properly chargeable under FCAAP.

The State's examples and the United States' responses are highly fact-intensive and require the application of an esoteric area of administrative regulation. Reviewing the State's points and the United States' counterpoints, the United States has raised plausible explanations why reimbursement was denied in each of these examples, and whether a particular case note substantiates a service as reimbursement is a matter squarely within agency expertise and, under the APA, the Court is enjoined "not to substitute its judgment for that of the agency."

*Motor Vehicle*, 463 U.S. at 43. The State has failed in its burden to convince the Court that the United States' interpretation of these matters is arbitrary, capricious or erroneous as a matter of law.

### E.     The OIG's Classification of Administrative Costs

The State objects to CMS's disallowance of "$12,387,285 in administrative costs incurred by the OCFS to provide child management services to children and families." *Pl.'s Mot.* at 14. Maine contends that the "manner in which the OIG calculated the amount of unallowable administrative costs is unsupported by substantial evidence in the record, arbitrary and inconsistent with its own determination as to the percentage of time spent by case workers providing case management services." *Id.*

#### 1.     Maine's Contentions

##### a.     *Bowen* and the OIG Audit

Maine explains its view of the details of the OIG audit. It points to the OIG's explanation for its disallowance of Family Services administrative costs by saying that it determined that "the administrative costs included in the Family Services accounting records were related to overall operation of Family Services and the administration of all Federal awards that Family Services received." *Pl.'s Mot.* at 14 (citing A.R. at 344). Furthermore, Maine says that the OIG deemed the payroll costs of those listed in the state plan as authorized to provide case management services as "allowable" costs, but to classify the payroll costs of support staff as "unallowable." *Id.* at 15 (citing A.R. at 134). The OIG then reduced the total

payroll costs by the percentage of "unallowable" payroll to the total payroll. *Id.* (citing A.R. at 135). The State says that the OIG further reduced administrative costs by excluding telephone, cellular phone, office supply, and travel expenses. *Id.* (citing A.R. at 133). Although the OIG claimed that these administrative costs were not appropriate because they were potentially allowable under other federally-funded programs, Maine complains that the OIG "produced no evidence that the State had recovered these costs under both programs." *Id.*

Maine argues that the OIG's approach violates the First Circuit's directive in *Bowen*. *Id.* In *Bowen*, the federal government attempted to characterize the Massachusetts Department of Education (DOE) as a "third party" with an independent obligation to provide special education services under commonwealth law. 816 F.2d at 803. Under the concept of "payor of last resort", if the Massachusetts DOE was a third party under Medicaid law, then Massachusetts, not the federal government, would be responsible for special education services. *Id.* The First Circuit rejected the federal government's argument, noting that the Massachusetts DOE along with the Massachusetts Department of Public Welfare are "subdivisions of the Commonwealth of Massachusetts". *Id.* Thus, "[t]hat they appear to be 'third party' to one another is an artifact of the Commonwealth's internal organization." *Id.* The *Bowen* Court concluded that "[t]his Medicaid reimbursement decision should not turn on how a state subdivides its social welfare functions and authority." *Id.* The State contends that the OIG audit violated

*Bowen* by focusing on the agency within the State that provided the service, not the nature of the service itself. *Id.* at 16.

> **b.** **Arbitrary Classification of Personnel and Activities**

Maine objects to the OIG's refusal to include as reimbursable the cost of support staff and out of pocket expenses. *Id.* at 16–17. It says that the OIG has given "[n]o reason . . . for this otherwise arbitrary distinction." *Id.* at 17. It then asserts that in its "explanation to the Board," the OIG cited SMM § 4302 and proposed that because the Medicaid beneficiaries were referred to the OCFS from third parties, such as law enforcement or medical professionals, federal reimbursement is not available. *Id.* at 17. According to Maine, this interpretation of § 4302 is unsupported and irrational since it would "virtually eliminate OCFS as a provider of Medicaid targeted case management services." *Id.* In addition, the State says that Medicaid itself has recognized that state agencies providing non-Medicaid case management services may simultaneously provide Medicaid TCM. *Id.* (citing 42 U.S.C. § 1396n(g)(2)). Finally, Maine says that even though the OIG "implicitly determined that about half the time of OCFS case workers in the two audit years was spent providing case management services, . . . it made no effort to allocate the disallowed administrative costs to that portion of case worker activities which it found not allowable." *Id.* at 17–18.

> **2.** **The United States' Response**

The United States disagrees with Maine's premise. It says that the OIG based its audit not only on assumptions about the work performed at the state

OCFS, but also on a detailed review of the actual case notes of the workers. *Def.'s Resp.* at 7. It points out that in *Sebelius*, the district court addressed the same *Bowen* argument and rejected it. *Id.*

Furthermore, the United States observes that in its decision, the Board "recount[ed] how the State had been asked to explain its assertions regarding administrative costs and that the Board found that what the State had submitted was not meaningful and did not refute what the OIG had determined." *Id.* at 9 (citing A.R. at 11–14). It quotes the Board as saying that the State "has not alleged, much less proved, that the particular administrative costs identified by the OIG as unallowable . . . were incurred, in whole or in part, to support the provision of allowable TCM services" and that the State "furnished no evidence that it allocated OCFS administrative costs to Medicaid based on an approved cost allocation plan." *Id.* (quoting A.R. at 13).

Moreover, once the issue of administrative costs was raised before the Board and CMS complied with the Board's order to develop the record, the Board wrote that "[t]he State has not questioned the OIG's and CMS's explanation for the audit finding concerning administrative costs. We thus conclude that CMS (through [the] OIG) adequately explained the basis for its finding that the State's TCM claims included $12,070,279 in unallowable administrative costs." *Id.* at 9–10 (citing A.R. at 12).

The United States contends that:

A claim for Medicaid administrative cost is separate and not part of a claim for the direct Medicaid service of [TCM] services. In removing

administrative costs from the State claim for TCM, [the] OIG recognized that TCM, as a claim for direct Medicaid service, could not be performed other than by those designated as TCM providers in the State plan and that other services had to be classified as administrative."

*Id.* at 10.  It also observed that the "State has administrative cost claims as part of its social services programs and as part of its Medicaid program and those administrative cost claims are not the subject of the disallowance."  *Id.* (citing A.R. at 127–28, 133–36).

### 3.    The Board Decision

In its decision, the Board began by observing that Maine had asserted it was "difficult or 'impossible' to determine how the OIG determined that the State's TCM claims . . . included $12,070,279 in unallowable administrative costs."  A.R. at 11. The State demanded an explanation.  *Id.* at 12.  Consequently, the Board ordered CMS to provide a fuller explanation and CMS complied.  *Id.*  After CMS expanded upon its methodology and findings, the Board says the State "has not questioned the OIG's and CMS's explanation for the audit finding concerning administrative costs."  *Id.*  The Board thus concluded "that CMS (through the OIG) adequately explained the basis for its finding that the State's TCM claims included $12,070,279 in unallowable administrative costs."  *Id.*

The Board turned to the merits of the OIG finding.  *Id.*  It observed that the State contended that "the administrative costs identified by the OIG are potentially allowable because the state plan provides that payment rates will be 'cost based' without distinguishing between direct and indirect costs."  *Id.*  It recited the State's argument that "because state and federal law contemplate that TCM services will

be provided by state welfare or social service agencies, it follows that the administrative costs of those agencies must be reflected in the payment for those services." *Id.* The Board read these arguments as contending that "the administrative costs of a state agency are eligible for federal Medicaid reimbursement to the extent that they support the provision of allowable (Medicaid-covered) TCM services." *Id.* at 13.

The Board did not reach this overarching issue because the State failed to respond to the OIG explanation. *Id.* The Board said that the State "has not alleged, much less proved, that the particular administrative costs identified by the OIG as unallowable . . . were incurred, in whole or in part, to support the provisions of allowable TCM services." *Id.* The Board footnoted its observation that the State "furnished no evidence that it allocated OCFS administrative costs to Medicaid based on an approved cost allocation plan." *Id.* at 13 n.9.

The Board wrote that, in response to its order to develop the record, the State "assert[ed] that a portion of OCFS administrative costs from FFYs 2002 and 2003 were allocated to the title IV-E program." *Id.* at 13. The Board said that the "State [went] on to say that 'CMS may not disallow administrative costs that were not charged to Medicaid,' implying that CMS disallowed expenditures that had been charged to the title IV-E program and were not included in the State's TCM for FFYs 2002 and 2003." *Id.*

The Board described the State's position regarding the OIG disallowance but emphasized that Maine had made its assertions "<u>before</u> the State received the OIG's

response to our questions regarding administrative costs." *Id.* (emphasis in original). The Board wrote that "[t]he State did not question or dispute any aspect of that explanation or otherwise explain why its contentions regarding administrative costs continued to be relevant and persuasive in light to the OIG's detailed response to our order." *Id.* The Board finally noted that the "State also failed to submit evidence demonstrating that CMS had disallowed expenditures that were not charged to its Medicaid program." *Id.* at 13–14. The Board thus accepted the OIG's finding. *Id.* at 14.

### 4. Discussion

#### a. Waiver

The Court concludes that the State waived the right to present this argument on appeal. The sequence, as described by the Board, was that Maine attacked the OIG methodology, and responding to the State's contention, the Board ordered the OIG to supplement the record and provide a detailed explanation. After the OIG did so, Maine failed to respond.

The Board took Maine's silence as acquiescence, writing that "[t]he State has not questioned the OIG's and CMS's explanation for the audit finding concerning administrative costs." *Id.* Although the State had maintained that the OIG erred in failing to include a percentage of administrative costs which should have been allowed, Maine failed to document what percentage of administrative expenses the OIG had improperly denied. In the face of the State's silence, the Board accepted the OIG's explanation. Under agency precedent, the United States has "the initial

burden to provide sufficient detail about the basis for its determination to enable the grantee to respond" and the grantee then has the obligation "to show that the disputed expenditures are allowable." A.R. at 9 (citing *Mass. Exec. Office of Health and Human Servs.*, DAB No. 2218, at 4 (2008)). In effect, the Board concluded that the United States had met its initial burden and by its silence, Maine had failed to meet its burden.

Generally, the APA requires that, before a party may present an argument on appeal, the party must have allowed the agency "to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37 (1972); *Ezratty v. Puerto Rico*, 648 F.2d 770, 774 (1st Cir. 1981). Here, after receiving the OIG's explanation, Maine held back and failed to respond and the Board concluded that it "need not decide whether, or how, FFP may be claimed for such administrative costs because the State has not alleged, much less proved, that the particular administrative costs identified by the OIG as unallowable . . . were incurred, in whole or in part, to support the provision of allowable TCM services." A.R. at 13. In short, the Board did not reach the State's argument because the State did not press it at the Board. *Id.* Having failed to do so there, the State cannot press it here.

### b. Failure of Proof

Even if the State did not waive its arguments concerning administrative costs, its failure to respond to the OIG's explanation provides a sufficient basis for

the Board's decision. As noted earlier, the OIG report—as expanded in response to the Board Order—contains a rational explanation for its decision to disallow the administrative expenses. *See* A.R. at 344. The burden then shifted to the State; however, the State failed to respond, and failed to meet its burden.

No more is required. *See Bowman*, 419 U.S. at 290 (stating that because the Court could "discern in the Commission's opinion a rational basis . . ., the 'arbitrary and capricious' test does not require more"); *Sistema*, 234 F.3d at 777 (stating that the reviewing court must "focus on whether the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (internal quotation marks and brackets omitted)). Faced on one hand with the OIG's explanation and on the other with the State's silence, the Board rationally accepted the OIG's explanation. The Board's decision is supported by substantial evidence and must be upheld. *See Sistema*, 234 F.3d at 777.

### c.    *Bowen*

Maine insists that the OIG audit violated the *Bowen* Court stricture against making a Medicaid reimbursement decision based on how a state subdivides its social welfare functions and authority. *Pl.'s Mot.* at 15 –16. The Court is not convinced. The first OIG explanation reads:

> The State agency's costs included $12,070,279 in administrative costs incurred by Family Services. These costs were related to the overall operation of Family Services and the administration of all Federal awards that Family Services received. Examples include clerical salaries, mileage, unfunded retirement liability, and cellular phone service. Because these costs were not related to a specific medical assistance service but rather were 'administrative costs of services or

programs to which Medicaid beneficiaries are referred," they were not eligible a TCM costs.

A.R. at 285. After the State responded, the OIG further explained:

> The cost of administrative items that support delivery of direct foster care services, as described in CMS's 2001 letter, may not be included as a TCM cost. In reviewing the State's proposed TCM rate-setting methodology, we determined that the administrative costs the State proposed to include were related to the overall operation of Family Services and the administration of all Federal awards that Family Services received. Thus, the administrative costs should not be included as TCM service costs for purposes of calculating a monthly TCM rate. Accordingly, we determined that $12,387,285 incurred by Family Services to administer its programs was not reimbursable as Medicaid TCM services at the Federal Medical Assistance Percentage rate.

A.R. at 291. After the Board ordered the OIG to explain further, the OIG wrote:

> We determined that the administrative cost included in the Family Services accounting records were related to the overall operation of Family Services and the administration of all Federal awards that Family Services received. Thus, the administrative costs should not be included as TCM service costs for the purpose of calculating a monthly TCM rate.

A.R. at 344. Recognizing that administrative costs may be subject to special allocation and approval requirements, the Board interpreted these OIG comments as demonstrating that the State had failed to demonstrate that the "particular administrative costs . . . were incurred, in whole or in part, to support the provision of allowable TCM services." A.R. at 13.

The *Bowen* Court prohibits the federal government from using "an artifact" of the State's "internal organization" to deny federal benefits; in other words, "Medicaid reimbursement decision[s] should not turn on how a state subdivides its social welfare functions and authority." *Bowen*, 816 F.2d at 803. *Bowen* does not

prohibit the federal government from requiring a state agency, which administers several federal programs, to prove the percentage of its overall administrative costs, which is properly allocable to a particular federal program and to demonstrate that it had obtained the necessary approvals for reimbursement. The Board's decision was based on Maine's failure of proof, not Maine's internal organization. *Bowen* is not applicable.[13]

## IV. CONCLUSION

The Court GRANTS Defendants' Motion for Judgment on the Pleadings, or in the Alternative, for Summary Judgment (Docket # 9) and the Court DENIES the Plaintiff's Motion for Summary Judgment (Docket # 16).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of February, 2011

---

[13] In the State's Response to the United States' opposition to its motion for summary judgment, Maine raised for the first time an accusation that "CMS disallowed the administrative costs of providing case management services twice, once through its calculation of an allowable rate and once directly." *Pl.'s Reply* at 4. This is the very first time Maine has raised this argument. It appears nowhere in the Board Decision, in Maine's Complaint, or in its motion for summary judgment. Maine waited until the very last pleading, a reply to the United States' response to its motion for summary judgment to raise a new issue for the very first time. Maine has waited too long. The Court has no response from the Board on this issue and, based on the State's delay, no response from the United States. The Court will not address an issue that has not fairly been presented.